UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA,      )
                                    )
          Plaintiff,       )
                                    )
v.                               )     No.:   3:23-CR-33-TAV-DCP-1
                                    )
CHRISTOPHER EDWARD ALLEN,   )
                                    )
          Defendant.    )

## MEMORANDUM OPINION AND ORDER

This criminal case is before the Court on defendant's objections [Doc. 52] to the Presentence Investigation Report ("PSR"). The government responded to these objections [Doc. 53], and defendant filed a reply [Doc. 54]. The Court bifurcated the sentencing in this case to hear argument on the objections prior to imposing sentence [Doc. 62]. On May 20, 2025, at the first phase ("Phase I") of the sentencing hearing, the Court heard argument as to defendant's PSR objections [Doc. 63]. For the reasons discussed below, defendant's objections [Doc. 52] will be **SUSTAINED in part** and **OVERRULED in part**.

## I.    Background

On March 15, 2023, a federal grand jury returned an indictment, charging defendant with: (1) attempted production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e) (Counts 1 & 8); (2) production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e) (Count 3); (3) enticement of a minor, in violation of 18 U.S.C. § 2422(b) (Counts 2, 4, & 9); (4) transfer of obscene material, in violation of 18 U.S.C. § 1470 (Count 5); and (5) transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1)

(Counts 6 & 7) [Doc. 1].  The case proceeded to trial on September 23, 2024 [Doc. 37].  The jury ultimately found defendant guilty on all counts [Doc. 40].

On January 2, 2025, the probation officer disclosed the PSR [Doc. 50].  Defendant filed objections [Doc. 52], the government responded [Doc. 53], and defendant replied [Doc. 54].  A revised PSR ("RPSR") was then disclosed [Doc. 61], along with an addendum to the PSR [Doc. 60].  The Court subsequently entered an order, bifurcating the sentencing hearing, and ordering the parties to be prepared to address specific questions relating to defendant's PSR objections at Phase I of the sentencing hearing [Doc. 62].  On May 20, 2025, the Court conducted Phase I of the sentencing hearing and heard oral argument on defendant's objections [Doc. 63].  The probation officer subsequently filed a second addendum to the PSR, setting forth the guideline ranges that would apply based on the potential outcomes of defendant's objections [Doc. 64].  No party has objected to those calculations.

## II.   PSR Objections

Under Federal Rule of Criminal Procedure 32(f), after receiving the PSR, a party may submit any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report.  Fed. R. Crim. P. 32(f)(1).  The Court then must either rule on the disputed portions of the PSR or determine that a ruling is unnecessary either because the matter will not affect sentencing or because the Court will not consider the matter in sentencing.  Fed. R. Crim. P. 32(i)(3)(B).  The Sixth Circuit requires "literal compliance" with this rule,

2

because the sentencing court's factual findings "help to ensure that defendants are sentenced on the basis of accurate information and provide a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case." *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997) (internal quotation marks and alterations omitted).  Once a defendant raises an objection, the Court must make a factual finding by a preponderance of the evidence.  *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007).

### A.    Legal Address (Page 3)

Page 3 of the PSR provides identifying data about defendant and lists his legal address as "701 Forrest Brook Lane Apartment 373 Kingston, Tennessee 37763" [PSR, p. 3].  Defendant objects to the listing of this legal address, which he states was his former residence prior to his arrest [Doc. 52, p. 1].  Defendant asks that his legal address be changed to that of his parents, namely, 206 Bradshaw Hollow Road, Rockwood, Tennessee 37854 [*Id.*].  The government does not oppose updating defendant's legal address [Doc. 53, p. 1].  The RPSR amends defendant's legal address as requested in his objection [Doc. 61; *see also* Doc. 60, p. 1].  In light of the amendment in the RPSR, defendant's first objection is **OVERRULED AS MOOT**.

### B.    Offense Conduct & Relevant Conduct (Paragraphs 13-41)

Paragraphs 13 through 32 contain summaries of the offense conduct in this case, drawn from the trial evidence [PSR ¶¶ 13–32].  Paragraphs 33 to 41 contain additional

3

information of relevant conduct, involving additional victims, as "Justification for USSG §4B1.5 Enhancement" [*Id.* ¶¶ 33–41].

Defendant objects to the offense conduct contained in paragraphs 13 to 32 [Doc. 52, p. 1]. Defendant acknowledges that he was convicted by a jury, but nonetheless objects to the conduct in these paragraphs for preservation purposes [*Id.*]. The government states that defendant appears to concede that his blanket denial of his offense conduct is foreclosed by the jury's guilty verdict [Doc. 53, p. 1].

To the extent that defendant objects to the facts contained in Paragraphs 13 to 32, those facts are taken from the trial testimony in this case, and the jury has found those facts beyond a reasonable doubt, given the guilty verdicts on all counts. To the extent that any of these facts are not determined by the jury's verdicts, the Court nonetheless finds that the government has proven these facts by a preponderance of the evidence based on the trial testimony. Accordingly, defendant's objection to Paragraphs 13 to 32 is **OVERRULED**.

Defendant also objects to additional relevant conduct included for justification of § 4B1.5 in Paragraphs 33 to 41 [Doc. 52, p. 1]. However, defendant lumps his objection to these paragraphs together with his objection to the facts in the PSR relating to the instant offenses, which he acknowledges are based on the jury's verdict [*Id.*]. The government responds that defendant "appears to concede that his blanket denial of his offense conduct is foreclosed by the jury's verdict," without distinguishing between defendant's objections to the facts supporting the instant offenses and the facts supporting the other conduct [Doc. 53, p. 1].

However, the facts contained in Paragraphs 33 to 41 involve matters outside the scope of the evidence presented at trial. Even after Phase I of the sentencing hearing, it is somewhat unclear whether defendant is objecting to the content of these paragraphs. Nonetheless, liberally reading defendant's written objections [Doc. 52], it appears that defendant does object to these factual paragraphs. And, in its order bifurcating the sentencing hearing, the Court directed the parties to "be prepared to present any evidence regarding defendant's objection to Paragraphs 33 to 41 of the Presentence Investigation Report, that is, the factual background supporting the enhancement under Section 4B1.5" [Doc. 62, p. 2]. But neither party presented any evidence at Phase I of the sentencing hearing, but rather, presented only argument.

A "defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth," and instead, "must produce some evidence that calls the reliability or correctness of the alleged facts into question." *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) (quoting *United States v. Mustread*, 42 F.3d 1097, 1102 (7th Cir. 1994)). Only after the defendant meets this burden of production does the burden shift to the government to "convince the court that the PSR's facts are actually true." *Id.* (quoting *Mustread*, 42 F.3d at 1102). Here, defendant presented no such evidence, but rather, simply lumped all factual paragraphs together in one objection made for preservation purposes [*See* Doc. 52]. Because he presented no evidence to dispute the facts contained in Paragraphs 33 to 41 of

5

the PSR, he has not met his burden of objecting to such facts, and therefore, his objection to these paragraphs is **OVERRULED**.[1]

### C. Section 2G2.1(b)(4)(A) Enhancement (Paragraph 68)

Paragraph 68 of the PSR adds a 4-level enhancement under § 2G2.1(b)(4)(A) because the offense involved "sadistic or masochistic conduct or other depictions of violence" [PSR ¶ 68]. Section 2G2.1(b)(4) states that "[i]f the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence . . . increase by 4 levels." U.S. SENT'G GUIDELINES MANUAL § 2G2.1(b)(4) (U.S. SENT'G COMM'N 2024).[2] The PSR states, in support of application of this enhancement, that "E.E. sent the defendant at least four images of her masturbating with a hairbrush" [PSR ¶ 68].

Defendant disputes whether the images at issue portray sadistic or masochistic conduct or other depictions of violence [Doc. 52, p. 2]. He states that the four images at issue depict a "post-pubescent female victim masturbating with a hairbrush" and "[t]here is no indication that the hairbrush caused physical pain, mental anguish, or was used violently" [*Id.*]. Defendant argues that the four corners of the images do not warrant the

---

[1] However, the Court notes that the inclusion of Paragraphs 33 to 41 in the PSR has no impact on the application of § 4B1.5(b) or the guideline range in this case, as discussed further *infra*. Defendant admitted during Phase I of the sentencing hearing that the facts established as part of this case, standing alone, were sufficient to support the enhancement under § 4B1.5(b). Thus, even if the Court were to sustain defendant's objection to Paragraphs 33 to 41 of the PSR, it would have no impact on the applicability of the enhancement.

[2] Section 2G2.2(b)(4) and Section 2G3.1(b)(4) contain identical language regarding sadistic or masochistic conduct or other depictions of violence, applying such enhancement to different offenses. *See* U.S. SENT'G GUIDELINES MANUAL §§ 2G2.2(b)(4), 2G3.1(b)(4) (U.S. SENT'G COMM'N 2024).

6

enhancement [*Id.* at 3]. According to defendant, there is no outward manifestation of violence displayed by the minor in the pictures; there are no attributes of the hairbrush that would cause one to think that the insertion of the objection would be painful; and there is not an objective appearance of mental anguish or humiliation [*Id.*]. Finally, defendant notes that the victim willfully engaged in a weeks-long ongoing conversation with him that was only sometimes sexually graphic [*Id.*].

The government responds that it is settled law that this enhancement is warranted when the sexual act depicted "is likely to have been painful" [Doc. 53, pp. 1–2]. The government states that this case "requires the Court to determine whether a thirteen-year-old girl would *objectively* experience pain and humiliation when, at an adult male's behest, she inserts a hairbrush into her vagina" [*Id.* at 2 (emphasis in original)]. The government contends that the Sixth Circuit has previously found that "[p]enetration of private parts with a hairbrush [] raises similar concerns to penetration by male anatomy," specifically the concern "that penetration of minors' bodies causes pain" and thus held that images of a 13-year-old girl being penetrated by a hairbrush were "sadistic" [*Id.* at 2 (quoting *United States v. Preston*, No. 23-5675, 2024 WL 4590865 (6th Cir. Oct. 28, 2024))]. The government also contends that the Sixth Circuit held that "it is humiliating for a child to insert a hairbrush into her private parts," and that the facts of this case support this conclusion [*Id.*]. Ultimately, the government contends that precedent and common sense indicate that images of a 13-year-old girl inserting a hairbrush into her vagina depict pain and humiliation, and therefore, the enhancement is properly applied [*Id.* at 3].

7

Defendant replies that the facts of this case are distinguishable from *Preston* [Doc. 54, p. 1]. Specifically, in that case, the defendant blackmailed the underage victim until she sent images and video containing sexual content, some of which involved the victim inserting a hairbrush into her vagina [*Id.*]. The defendant then threatened to post these images online and harassed the victim until she complied with his demands, and, as a result, the victim engaged in self-harm and was suicidal [*Id.*]. But, here, defendant argues, there was no testimony that he forced the minor victim to send him these pictures or videos [*Id.* at 2]. He contends there was no indication that the minor victim was participating against her will, nor were there any indications of pain or humiliation [*Id.*].

The probation officer responds that the Court has discretion to make a case-by-case determination whether § 2G2.1(b)(4)(A) is applicable [Doc. 60, p. 2]. The probation officer states that the conduct at issue was unforced, but it is unknown whether it caused the victim pain or humiliation [*Id.*]. Nonetheless, the probation officer notes that the defendant solicited the victim to engage in the conduct [*Id.*]. And the probation officer concludes that, in light of the "context leading to the produced visual depiction" it appeared objectively sadistic [*Id.* at 3].

"[W]hether a particular image can be classified as portraying sadistic or masochistic conduct under § 2G2.1(b)(4) is an objective determination." *United States v. Corp*, 668 F.3d 379, 389 (6th Cir. 2012). "Thus, the court must consider what the material at issue actually portrays rather than making subjective determinations about the thoughts or intentions of the specific individuals being depicted." *Id.* "The general meaning of sadism

8

is the inflction of pain upon a love object as a means of obtaining sexual release." *United States v. Cover*, 800 F.3d 275, 280 (6th Cir. 2015) (internal quotation marks omitted) (addressing the enhancement under U.S.S.G. § 2G2.2(b)(4)). "[T]o apply the § 2G2.1(b)(4) enhancement, a sentencing court must determine by a preponderance of the evidence that an image or material (1) depicts sexual activity involving a minor and (2) portrays conduct that would cause an objective viewer to believe—without regard to the undepicted circumstances of the sexual encounter—that the pictured activity is inflicting physical pain, emotional suffering, or humiliation of that minor." *Corp*, 668 F.3d at 389–90.

In *United States v. Preston*, the Sixth Circuit stated:

> This case requires examining whether photos of a middle- and high-school aged girl inserting objects into her private parts are sadistic. They are. Common sense tells us as much. To ask the question whether inserting foreign objects into a young girl's private parts is painful and humiliating is to answer it.

2024 WL 4590865, at *4. The court reviewed other precedent holding that penetration of prepubescent females was inherently sadistic, stating that "the logic is that at the time of the offense, the disparity between an adult's size and a child's body is such that an adult male's penetration of a child necessarily causes pain." *Id.* The Sixth Circuit then held that:

> The same calculus applies here. Thirteen-year-olds haven't completed puberty. Penetration of private parts with a hairbrush and pencil raises similar concerns to penetration by male anatomy. It raises the familiar concern that is consistent across caselaw: that penetration of minors' bodies causes pain. Thus, images of such conduct are sadistic. Moreover, the photos in question are also humiliating. It is humiliating for a child to insert a hairbrush into her private parts. Therefore, images of that conduct are sadistic.

9

*Id.*  The Sixth Circuit rejected defendant's argument that any "discomfort, humiliation, and degradation" caused were minimal, noting that it did not matter whether the victim herself was experiencing pain, but rather, the court must determine whether an observer would determine the images depict the infliction of pain or humiliation on a minor.  *Id.* at *5.  The Sixth Circuit concluded that "inserting foreign objects into a child's body is objectively painful and humiliating," and therefore, the four-level enhancement under § 2G2.1(b)(4) for sadistic or masochistic conduct was appropriately applied.  *Id.*

*Preston* is dispositive of defendant's objection to the application of the § 2G2.1(b)(4) enhancement in this case.  The Sixth Circuit in *Preston* specifically held that photographs of a girl the same age as E.E. (13 years old) [*see* PSR ¶ 16], engaging in the same conduct as E.E. (inserting a hairbrush into her vagina) [*see id.*], was *objectively* both painful *and* humiliating, and therefore, sadistic under either definition.  *Preston*, 2024 WL 4590865, at *4–5.  Defendant attempts to avoid this conclusion by contrasting the surrounding circumstances in the *Preston* case to the circumstances in this case [Doc. 54, pp. 1–2].  But this argument seeks to turn the inquiry into a subjective, rather than objective, question.  And, under the Sixth Circuit's precedent, this is improper.  Rather, the Court must look at what an objective viewer would think about the images "without regard to the undepicted circumstances of the sexual encounter."  *Corp*, 668 F.3d at 389–90.  The Sixth Circuit has already answered that objective question—"inserting foreign objects into a [13-year-old's] body is objectively painful and humiliating," and therefore, sadistic for purposes of § 2G2.1(b)(4).  *Preston*, 2024 WL 4590865, at *4–5.  Accordingly, defendant's

10

objection to the 4-level enhancement under § 2G2.1(b)(4) contained in Paragraph 68 of the PSR is **OVERRULED**.

### D.     Section 4B1.5(b)(1) Enhancement (Paragraph 85)

Paragraph 85 of the PSR adds a 5-level enhancement under Section 4B1.5(b)(1) of the Guidelines, because the defendant "engaged in a pattern of activity involving prohibited sexual conduct" as described in Paragraphs 33 to 41 [PSR ¶ 85].[3]

Section 4B1.5(b) states:

> In any case in which the defendant's instant offense of conviction is a *covered sex crime*, neither §4B1.1 nor subsection (a) of this guideline applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct:
>
> > (1)     The offense level shall be 5 plus the offense level determined under Chapters Two and Three. . . .

U.S. SENT'G GUIDELINES MANUAL § 4B1.5(b) (U.S. SENT'G COMM'N 2024) (emphasis added).  Application Note 2 of the Commentary defines "covered sex crime" for purposes of this enhancement as:

> (A) an offense, perpetrated against a minor, under (i) chapter 109A of title 18, United States Code; (ii) *chapter 110 of such title*, not including trafficking in, receipt of, or possession of, child pornography, or a recordkeeping offense; (iii) *chapter 117 of such title*, not including transmitting information about a minor or filing a factual statement about an alien individual; or (iv) 18 U.S.C. § 1591; or (B) an attempt or a conspiracy

_____

[3] As discussed *supra*, the Court has excluded Paragraphs 33 to 41 of the PSR from consideration, sustaining defendant's apparent objection to the lack of evidentiary support for the facts contained therein.  But, at Phase I of the sentencing hearing, defendant, through counsel, acknowledged that the facts of this case, alone, would be sufficient to support the enhancement under § 4B1.5.  Because the parties do not dispute whether the facts of the case would support the enhancement, if the enhancement is properly applied to defendant's offenses of conviction, the Court need not reach this issue.

11

to commit any offense described in subdivisions (A)(i) through (iv) of this note.

U.S. Sentʼg Guidelines Manual § 4B1.5(b) cmt. n.2 (U.S. Sentʼg Commʼn 2024) (emphasis added). Defendantʼs convictions in Counts 1, 3, 6, 7, and 8, involving the production, attempted production, and transportation of child pornography, fall within Chapter 110 of Title 18.[4] Defendantʼs convictions in Counts 2, 4, and 9, involving attempted enticement of a minor, fall under Chapter 117 of Title 18.

In his objection, defendant contends that application of the 5-level enhancement under § 4B1.5(b)(1) to his convictions for production of child pornography exceeds Congressʼs authorization of the enhancement, as set forth in Section 505 of the Protection of Children from Sexual Predators Act of 1998 ("the Sexual Predators Act") [Doc. 52, pp. 3–4]. According to defendant, Congress limited the directive to promulgate a new guideline enhancing defendants that are repeat and dangerous sex offenders to specific sections of the criminal code [*Id.* at 4]. Defendant contends that the Sentencing Commission ("the Commission") fulfilled this directive by enacting § 4B1.5, but also violated that directive, by expanding the list of offenses to which the enhancement would apply beyond those enumerated offenses [*Id.*]. Defendant contends that it is clear from the

---

[4] Defendantʼs convictions for transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1) in Counts 6 and 7, however, constitute "trafficking" of child pornography, and therefore, are excluded from the term "covered sex offense" per the language of Application Note 2. *See United States v. Perez*, 61 F.4th 623, 628 (8th Cir. 2023) (stating that transportation of child pornography is expressly excluded by the Guidelinesʼ definition of "covered sex crime."). Accordingly, of the Chapter 110 offenses, only defendantʼs convictions in Counts 1, 3, and 8 could potentially qualify as a "covered sex offense" for purposes of § 4B1.5.

legislative history that Congress only intended the increased punishment to apply to the enumerated offenses [*Id.* at 6].

Defendant also asserts that the application of the enhancement in this case violates *Kisor v. Wilkie*, 588 U.S. 558 (2019), which limits the amount of deference given to the Guidelines' commentary when interpreting the Guidelines themselves [*Id.* at 5]. Defendant argues that the text of § 4B1.5 is not genuinely ambiguous after applying the traditional tools of statutory construction, and therefore, the commentary's definition of "covered sex crime" should not be given deference [*Id.*].

The government responds that Section 505 of the Sexual Predators Act expressly lists a violation of 18 U.S.C. § 2422(b) (enticement) as one of the offenses warranting enhanced punishment and defendant was convicted of three offenses under § 2422(b) [Doc. 53, pp. 4–5].

Moreover, the government contends that production of child pornography fits comfortably within the meaning of "covered sex crime" under the *Kisor* framework [*Id.* at 5]. The government states that, by its very title § 4B1.5 unambiguously applies to repeat and dangerous sex offenders, and production of child pornography is an inherently dangerous offense [*Id.* at 6]. The government contends that while Section 505 of the Sexual Predators Act listed enumerated offenses, nothing in that provision suggested that the Commission should restrict the resulting amendment to only those offenses [*Id.*]. Even if the plain language of § 4B1.5 is ambiguous, the government contends that Application Note 2 falls "within the zone of ambiguity" as it was meant to apply to "dangerous" sex

13

offenses, and the Commission could reasonably determine that production of child pornography is a dangerous sex offense [*Id.* at 7]. Finally, the government contends that the character and context of the Commission's reading entitles it to deference as the commentary represents the official position of the Commission, implicates the Commission's expertise and considered judgment, and is not an ad hoc pronouncement [*Id.*].

Defendant replies in agreement that Section 505 of the Sexual Predators Act includes enticement of a minor as an enumerated offense [Doc. 54, p. 2]. Defendant states that, using this reasoning, the § 4B1.5 enhancement should apply to the offense level calculated for the enticement counts, which yield a lower base offense level [*Id.*]. Defendant states that he supports this approach if the Court finds it appropriate [*Id.*].

However, defendant disputes that a conviction for production of child pornography "fits comfortably" within the definition of a "covered sex crime," citing the enumerated offenses in the Sexual Predators Act [*Id.* at 2–3]. Defendant contends that the government's interpretation ignores the canon of *expressio unius est exclusio alterius*, or, the expression of one thing is the exclusion of another [*Id.* at 3–4]. Defendant contends that, because Section 505 expressed a specific list of offenses to which the enhancement would apply, offenses not included are excluded [*Id.* at 4]. Moreover, Section 502 of the Sexual Predators Act gave the Commission a broader directive to fashion sentencing enhancements for Chapter 117 offenses, and thus, if Congress wanted Section 505 to encompass Chapter 110 offenses, it would have done as it did in Section 502 [*Id.*].

14

Before turning to its analysis, the Court notes that it is somewhat difficult to organize the parties' arguments on the application of § 4B1.5, as they appear to collapse multiple issues into one argument. Defendant raises arguments regarding both (1) the authority of the Commission to promulgate § 4B1.5, at least as broadly as defined in Application Note 2, and (2) whether the Commission's interpretation of the term "covered sex offense" in § 4B1.5, as contained in Application Note 2, is entitled to deference under *Kisor* [Docs. 52, 54]. Although defendant lumps his arguments regarding these issues together, it appears to the Court that they are alternate, albeit related, grounds for relief. Indeed, it appears that defendant has adopted his arguments from an appellate brief in an appeal before the Eleventh Circuit Court of Appeals.[5] Brief for Appellant at 15–27, *United States v. Williamson*, No. 22-13081, 2023 WL 5348898 (11th Cir. Aug. 21, 2023), 2023 WL 416251 at *15–27.[6] And, in Williamson's brief, he specifically expressed that the

---

[5] The Eleventh Circuit ultimately found it unnecessary to address Williamson's arguments regarding the applicability of § 4B1.5(b), because the district court, in imposing sentence, explicitly stated that it would have imposed the same sentence even without the enhancement. *United States v. Williamson*, No. 22-13081, 2023 WL 5348898, at *2 (11th Cir. Aug. 21, 2023).

[6] Indeed, both defendant's written objection and his reply brief appear to be directly taken from the brief in *Williamson*, with minor modifications. *Compare e.g.*, Doc. 52, p. 4 ("[B]y satisfying the Congressional call, [the Commission] also violated the very same directive by unilaterally expanding the list of offenses that the enhancement should apply to") *with* Brief for Appellant, *Williamson*, 2023 WL 416251, at *16 ("The Commission fulfilled this directive, and violated it, at the same time . . . . [T]he Commission violated the directive by expanding it to include defendants convicted of additional offenses under Chapter 10 of title 18.") *and* Doc. 54, p. 4 ("First, because § 505 of the Act expressed a specific list of offense to which the enhancement would apply, any offenses not included are therefore excluded.") *with* Brief for Appellant, *Williamson*, 2023 WL 416251, at *26 ("First, § 505 expresses a specific list of crimes to which the anticipated enhancement would apply. The production of child pornography offense is not among the listed crimes – it therefore does not qualify for the enhancement.").

*Kisor* argument was an alternative to the delegation of authority issue. *See* Brief for Appellant, *Williamson*, 2023 WL 416251, at \*18 ("Alternatively, the application of the § 4B1.5(b) enhancement to [defendant], based upon his conviction for production of child pornography, violates *Kisor* . . . "). The Court concludes that defendant's arguments in this case are also best construed as alternate arguments. The Court will first address the issue of congressional delegation of authority before turning to the *Kisor* deference issue.

### 1. Congressional Delegation of Authority Issue

Based on the parties' arguments, and a review of the controlling law, it appears there are two potential sources of authority for the Commission to have promulgated § 4B1.5: (1) the Sentencing Reform Act; and (2) the Sexual Predators Act. The Court provides a brief summary of the history and contents of each Act.

### a. Sentencing Reform Act

By way of background, the Sentencing Commission is a body created as part of the Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551, *et seq.* and 28 U.S.C. §§ 991–998. *Mistretta v. United States*, 488 U.S. 361, 362 (1989); *see also* 28 U.S.C. § 991(a) ("There is established as an independent commission in the judicial branch of the United States a United States Sentencing Commission . . . ."). One of the purposes of the Commission is to "establish sentencing policies and practices for the Federal criminal justice system[.]" 28 U.S.C. § 991(b)(1). The Sentencing Reform Act directs the Commission to promulgate "guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case[.]" 28 U.S.C. § 994(a)(1).

16

In *Mistretta*, decided before *United States v. Booker*, 543 U.S. 220 (2005) (ruling that the Sentencing Guidelines were not mandatory), the Supreme Court addressed whether the Guidelines were unconstitutional because they were based on an excessive congressional delegation of authority to the Commission. 488 U.S. at 370–71. But the Supreme Court determined that the Sentencing Reform Act met the "intelligible principle"[7] test for congressional delegations of authority. *Id.* at 372. The Supreme Court stated that it "harbor[ed] no doubt that Congress' delegation of authority to the Sentencing Commission is sufficiently specific and detailed to meet constitutional requirements." *Id.* at 374. In *Booker*, the Supreme Court specifically indicated that its holding in *Mistretta*, upholding the validity of the delegation of authority to the Commission, was unaffected by its holding in that case. 543 U.S. at 242.

While the Sentencing Reform Act broadly delegates authority to the Commission to promulgate guidelines, it also sets forth specific directives and limitations of the Commission in promulgating guidelines. *See Mistretta*, 488 U.S. at 377 ("[A]lthough Congress granted the Commission substantial discretion in formulating guidelines, in actuality it legislated a full hierarchy of punishment-from near maximum imprisonment, to

---

[7] This so-called "intelligible principle" is derived from Chief Justice William Howard Taft's statement in *J.W. Hampton, Jr., & Co. v. United States*, 275 U.S. 394 (1928) that, as long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton*, 275 U.S. at 409); *see also Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482, 2497 (2025) ("To distinguish between the permissible and the impermissible in this sphere, we have long asked whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do.").

17

substantial imprisonment, to alternatives-and stipulated the most important offense and offender characteristics to place defendants within these categories."); *United States v. LaBonte*, 520 U.S. 751, 753 (1997) ("The Commission, however, was not granted unbounded discretion. Instead, Congress articulated general goals for federal sentencing and imposed upon the Commission a variety of specific requirements.").

For example, pursuant to the Sentencing Reform Act, in promulgating guidelines, the Commission is directed to "for each category of offense involving each category of defendant, establish a sentencing range that is consistent with all pertinent provisions of title 18[.]" 28 U.S.C. § 994(b)(1). The Sentencing Reform Act sets forth specific considerations to be taken into account both in establishing "categories of offenses" and "categories of defendants" and the appropriate sentences attached thereto. 28 U.S.C. § 994(c), (d).

The Sentencing Reform Act also directs the Commission to periodically "review and revise . . . the guidelines." 28 U.S.C. § 994(o). The Commission is authorized to promulgate and submit to Congress amendments to the guidelines each year. 28 U.S.C. § 994(p). But the Sentencing Reform Act "requires the Commission the comply with the notice and comment provisions of the Administrative Procedures Act . . . when promulgating guidelines." U.S. SENT'G COMM'N, THE HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES 4 (2009) [hereinafter HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES], available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/200910302000042_History_

Child_Pornography_Guidelines.pdf. In other words, under § 994(p), the Commission must submit proposed amendments to Congress and provide Congress with 180 days to modify or disprove the proposed amendment. *United States v. Butler*, 207 F.3d 839, 844 (6th Cir. 2000). Under this "report and wait" provision, if Congress does not act within that time frame, the proposed amendment will take effect. *Id.* In this way, "Congress retained ultimate authority over the federal sentencing guidelines." HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES, *supra*, at 5–6.

### b. Protection of Children from Sexual Predators Act of 1998

Section 505 of the Sexual Predators Act directs that:

Pursuant to its authority under section 994(p) or title 28, United States Code, the United States Sentencing Commission shall—

(1) review the Federal Sentencing Guidelines on aggravated sexual abuse under section 2241 of title 18, United States Code, sexual abuse under section 2242 of title 18, United States Code, sexual abuse of a minor or ward under section 2243 of title 18, United States Code, coercion and enticement of a minor under section 2422(b) of title 18, United States Code, contacting a minor under section 23422(c) of title 18, United States Code, and transportation of minors and travel under section 2423 of title 18, United States Code; and

(2) upon completion of the review under paragraph (1), promulgate amendments to the Federal Sentencing Guidelines to increase penalties applicable to the offenses referred to in paragraph (1) in any case in which the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor.

Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, § 505, 112 Stat. 2974 (1998). Sections 503 and 504 also contained this list of offenses and directed the Commission to promulgate amendments to the Guidelines to provide

19

enhancements to the guidelines for such offenses "if the defendant used a computer" and "if the defendant knowingly misrepresented the actual identity of the defendant" "with the intent to persuade, induce, entice, coerce, or facilitate the transport of a child . . . to engage in any prohibited sexual activity." *Id.*, §§ 503, 504. Section 507 of the Act also directed the Commission, with regard to any action within the scope of the Act, to "ensure reasonable consistency with other guidelines of the Federal Sentencing Guidelines[.]" *Id.*, § 507.

The Sexual Predators Act was first introduced in the House of Representatives as House Resolution ("H.R.") 3494 on March 18, 1998. 144 Cong. Rec. H1298-05, H1298, 1998 WL 1129149 (Mar. 18, 1998). This version of H.R. 3494 did not contain Section 505 or the other sections mentioned *supra*. *See* H.R. Rep. No. 105-557, 1998 WL 285821 (June 3, 1998). Instead, the only directive to the Commission H.R. 3494 initially contained was a directive that the Commission review the guidelines relating to offenses under 18 U.S.C. § 2423, and ensure that sentences for such "are appropriately severe and reasonably consistent with the relevant directives and with other guidelines." H.R. Rep. No. 105-557, at 678, 1998 WL 285821, *5 (June 3, 1998).

During debate of the bill in the House, several representatives emphasized the general goal of the bill was to provide harsh punishments for any type of sex crime against children. Representative Bill McCollum of Florida, who sponsored the House bill, stated that it was intended to respond "to the horrifying threat of sex crimes against children" and "sends a message to those individuals who commit these heinous crimes that they will be

20

punished swiftly and severely." 144 Cong. Rec. H4491-03, H4491, 1998 WL 306835 (June 11, 1998). Several other representatives reiterated the broad goal of severe punishment for a broad swath of offenses. Representative Jennifer Dunn of Washington stated: "This legislation makes it crystal clear to the most heinous of criminals, those who would prey on innocent children, make no mistake, you will be punished, and you will be punished to the full extent of the law." *Id.* at H4492. Representative Sheila Jackson-Lee of Texas emphasized the need to "make it known that there will be no tolerance, in fact zero tolerance, for sexual predators in this Nation; and . . . if there are such individuals thinking that they can get away with these heinous crimes, they will find serious punishment." *Id.* at H4493. Representative Robert "Bud" Cramer of Alabama emphasized: "[w]e cannot make this system tough enough. We cannot punish these offenders enough." *Id.* at H4495. Representative Marge Roukema of New Jersey stated that "[t]his bill's purpose is to strongly punish the obscene behavior of sexual predators who prey on children." *Id.* at H4496. Representative Ronald Packer of California highlighted that the bill "will toughen penalties for sexual predators, ensuring that they are held accountable for their actions." *Id.* at H4499. Representative Deborah Pryce of Ohio opined that "some of the most horrible crimes committed are sexual offenses against children. It is fitting that laws require severe penalties against offenders." 144 Cong. Rec. H4485-03, H4486, 1998 WL 306830 (June 11, 1998).

After several amendments, on June 11, 1998, the House of Representatives passed H.R. 3494. 144 Cong. Rec. D622-01, D622, 1998 WL 306990 (June 11, 1998). On June

21

16, 1998, the House referred H.R. 3494 to the Senate. 144 Cong. Rec. S6399-01, S6399, 1998 WL 314990 (June 16, 1998).

On September 17, 1998, H.R. 3494 was reported in the Senate with amendment. 144 Cong. Rec. S10518-02, S10520, 1998 WL 636904 (Sept. 17, 1998). Senator Orrin Hatch of Utah introduced the Senate version of H.R. 3494. *Id.* This version included Section 505 (as well as Sections 502, 503, 504, and 507) for the first time, and deleted the prior directive to the Commission regarding 18 U.S.C. § 2423. 144 Cong. Rec. H9987-02, 1998 WL 694714 (Oct. 7, 1998).

In introducing this version of the bill, Senator Hatch stated: "Sentences for child abuse and exploitation offenses will be made tougher. . . . [T]he bill will recommend that the Sentencing Commission reevaluate the guidelines applicable to these offenses, and increase them where appropriate to address the egregiousness of these crimes." 144 Cong. Rec. S10518-02, S10521, 1998 WL 636904 (Sept. 17, 1998). During debate, Senator Patrick Leahy of Vermont, who co-sponsored the Senate version of the bill, emphasized that "[t]he goal of H.R. 3494, and of the Hatch-Leahy-DeWine substitute, is to provide stronger protections for children from those who would prey upon them." 144 Cong. Rec. S12257-01, S12263, 1998 WL 701518 (Oct. 9, 1998). Senator Frank Lautenberg of New Jersey also highlighted that the bill "will provide tough punishment for those who would sexually abuse the youth of our Nation." *Id.* at S12265.

On October 9, 1998, the Senate passed H.R. 3494 as amended, and sent the bill back to the House. 144 Cong. Rec. D1137-02, D1139, 1998 WL 701593 (Oct. 9, 1998). During

22

debate, Representative Benjamin Gilman of New York noted that the bill "recognizes the extremely serious nature of child pornography and abuse, and imposes harsh penalties on pedophiles." 144 Cong. Rec. H10566-03, H10574, 1998 WL 708432 (Oct. 12, 1998). On October 12, 1998, the House of Representatives agreed to the Senate amendments to H.R. 3494. 144 Cong. Rec. D1157-01, D1158, 1998 WL 708602 (Oct. 12, 1998).

On October 30, 1998, President Bill Clinton signed H.R. 3494 into law. 144 Cong. Rec. H. 11709-02, H11710, 1998 WL 785665 (Nov. 12, 1998).

Subsequently, § 4B1.5 was enacted in 2001 as part of Amendment 615 to the Guidelines. U.S. SENT'G GUIDELINES MANUAL, app. C (Vol. II), amend. 615 (U.S. SENT'G COMM'N 2024). In the "background" to this portion of Amendment 615, the Commission stated:

> This guideline is intended to provide lengthy incarceration for offenders who commit sex offenses against minors and who present a continuing danger to the public. . . . In addition, section 632 of Pub. L. 102-141 and section 505 of Pub. L. 105-314 directed the Commission to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors.".

*Id.* Later, in the section labeled "Reason for Amendment," the Commission explicitly states that the amendment was "promulgated primarily in response to the Protection of Children from Sexual Predators Act of 1998, Pub. L. 105-314 . . . . In furtherance of the directives, the Commission initiated a comprehensive examination of the guidelines under which most sex crimes are sentenced." *Id.* The first part of the amendment, which creates § 4B1.5, "addresses the Act's directive to increase penalties in any case in which the defendant engaged in a pattern of activity of sexual abuse or sexual exploitation of a

23

minor." *Id.* Accordingly, at the time of the promulgation, the Commission appears to have viewed the authority to promulgate such amendment as stemming, at least in part, from the directives in the Sexual Predators Act.

<h3 style="text-align:center">c.     Analysis</h3>

While "Congress has delegated to the Commission significant discretion in formulating guidelines" that discretion still "must bow to the specific directives of Congress." *LaBonte*, 520 U.S. at 757 (internal quotation marks omitted); *see also* HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES, *supra*, at 6 (noting that "Congress retains the ability to influence federal sentencing policy by enacting directives to the Commission. These directives may be general or specific.  When Congress enacts such a provision, the Commission is obliged to implement the directive in a manner consistent with the legislation.").  "[S]entencing guidelines are to be interpreted and applied so that they are consistent with the statute that authorized them." *Butler*, 207 F.3d at 848.  "When assessing whether the Commission is acting within the scope of its delegated authority, courts follow basic administrative law concepts[.]" *United States v. Wilson*, No. 1:92-cr-138, 2024 WL 1556313, at *6 (N.D. Ohio Apr. 10, 2024).  But "when Congress and the Commission disagree on matters of sentencing policy, Congress trumps [and] [w]here the Guidelines and a statute conflict, the statute (an act of Congress) controls." *Butler*, 207 F.3d at 844 (internal quotation marks and alterations omitted) (quoting *United States v. Gaines*, 122 F.3d 324, 330 (6th Cir. 1997)).  "To determine whether a guideline adopted by the

24

Commission is at odds with the directives of Congress and must therefore give way, the language of the statute is looked at first." *Id.* at 845.

In determining whether the Commission was authorized to implement § 4B1.5, at least as applied to a conviction for production of child pornography, the Court first turns to Section 505 of the Sexual Predators Act. Defendant argues that Section 505 does not authorize such a broad enhancement, as production of child pornography is not one of the specifically enumerated offenses in Section 505. The government, on the other hand, argues that Section 505 is not a specific directive, but rather, a general directive to revise the guidelines for sex offenses.

While true that Section 505 is not as specific as some examples, such as those where the congressional directive instructs the Commission to raise the base offense level for a certain offense to a certain level, Section 505's directive is more specific than the government suggests. Although Section 505 does not specifically direct that the Commission create a five-level enhancement for offenders convicted of one of the enumerated offenses, if the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, the only specific detail not included is the number of levels, or even, the mannerism, in which to enhance the sentence under those circumstances. But, regardless, the plain language of Section 505 directs the Commission to increase penalties *for the enumerated offenses* when the defendant engaged in pattern of activity involving the sexual abuse or exploitation of a minor. *See* Sexual Predators Act § 505(2). Thus, Section 505 does not explicitly authorize the Commission to promulgate

25

an amendment to the guidelines to create a pattern-of-activity enhancement when the underlying conviction is not one of those enumerated in Section 505(1). In other words, Section 505 itself does not authorize promulgation of a pattern-of-activity enhancement for offenses falling under Chapter 110 of title 18, including production of child pornography offenses.

But the inquiry does not end there. Although Section 505's directive is limited to the offenses enumerated, the Court still must determine whether the Commission was otherwise authorized to promulgate a pattern-of-activity enhancement for Chapter 110 offenses. At Phase I of the sentencing hearing, the government pointed to two potential sources of authority for the enhancement at issue: (1) Section 507 of the Sexual Predators Act, and (2) the Sentencing Reform Act.

As noted previously, Section 507 of the Sexual Predators Act directs the Commission to "ensure reasonable consistency with other guidelines" when promulgating any amendments under the Act's directives. Sexual Predators Act § 507. This appears to be a general directive to promulgate other amendments to the guidelines, as necessary, to ensure consistency after promulgating amendments based on the more specific directions in other sections, including Section 505. Indeed, it appears that the Commission also viewed the Sexual Predators Act as providing both specific and general directives. *See* HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES, *supra*, at 32 ("The Sexual Predators Act provided both general and specific directives to the Commission"); U.S. SENT'G COMM'N, SEXUAL PREDATORS ACT POLICY TEAM, SENTENCING FEDERAL OFFENDERS:

26

PROTECTION OF CHILDREN FROM SEXUAL PREDATORS ACT OF 1998 1 (2000) [hereinafter "SENT'G FED. SEXUAL OFFENDERS"), available at https://www.ussc.gov/research/research-and-publications/sentencing-federal-offenders-protection-children-sexual-predators-act-1998 ("The Act contains both specific and general directives to the Commission to review relevant guidelines and, upon completion of the review, provide appropriate enhancements and otherwise increase penalties in certain circumstances, while ensuring 'reasonable consistency' among the guidelines and avoiding 'duplicative punishment.'").

Moreover, the legislative history indicates that Congress broadly intended the Sexual Predators Act to provide harsh punishments for all forms of sex offenses against children. *See* 144 Cong. Rec. H449103, H4493 (stating that the bill was intended to express "zero tolerance[] for sexual predators in this Nation"), H4499 (stating that the bill would toughen penalties for "sexual predators"); 144 Cong. Rec. H4485-03, H4486 (stating that the law should require "severe penalties" against those who commit "sexual offenses against children"); 144 Cong. Rec. S12257-01, S12263 (indicating that the goal of the bill was to "provide stronger protections for children from those who would prey upon them"), S12265 (stating that the bill "will provide tough punishment for those who would sexually abuse the youth of our Nation"); 144 Cong. Rec. H10566-03, H10574 (noting that the bill "recognizes the extremely serious nature of child pornography and abuse" and "imposes harsh penalties"). Section 507 appears to be intended by Congress as a type of "catch-all" provision in line with its goal of ensuring tough sentences for sex offenders. In light of the

27

legislative history and the text of Section 507, the Court concludes that Congress intended the Commission to broadly review the guidelines applicable to sex offenses against children and ensure they were consistent and sufficiently harsh.

The Court provides one further observation about the enactment of the directives in the Sexual Predators Act. In 1992, the Commission added a 5-level enhancement to the guideline for trafficking and receipt of child pornography when "a pattern of activity involving the sexual abuse of a minor" was present. U.S. SENT'G COMM'N, REPORT TO CONGRESS: SEX OFFENSES AGAINST CHILDREN: FINDINGS AND RECOMMENDATIONS REGARDING FEDERAL PENALTIES 34, 40 (1996) [hereinafter 1996 REPORT TO CONGRESS], available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/199606-rtc-sex-crimes-against-children/199606_RtC_SCAC.pdf; *see also* U.S. SENT'G GUIDELINES MANUAL § 2G2.2(b)(4) (U.S. SENT'G COMM'N 1998).[8] In its 1996 Report to Congress, the Commission noted that it was considering adding the pattern of activity enhancement to the production and possession of child pornography guidelines. 1996 REPORT TO CONGRESS, *supra*, at ii, 34, 40. The Commission stated that it found "no reason to limit this type of adjustment to the trafficking guideline." *Id*. at 34. Notably, after its enactment, the Commission believed that many provisions of the Sexual Predators Act were "congressional responses to recommendations made in the Commission's" 1996 Report to Congress, including its recommendations

_____

[8] This enhancement is still contained in the current guidelines, although it is now located at § 2G2.2(b)(5). *See* U.S. SENT'G GUIDELINES MANUAL § 2G2.2(b)(5) (U.S. SENT'G COMM'N 2024).

28

regarding a pattern of activity enhancement. SENT'G FED. SEXUAL OFFENDERS, *supra*, at 1. And it appears that the applicability of § 2G2.2(b)(4) to receipt and trafficking of child pornography offenses is why the Commission excluded trafficking and receipt offenses from the new enhancement in § 4B1.5(b). *See* U.S. SENT'G GUIDELINES MANUAL, app. C (Vol. II), amend 615 (U.S. SENT'G COMM'N 2024) (noting the similarity in the enhancements under § 2G2.2(b)(4) and § 4B1.5(b)). Considering all of this, it appears most likely that, because a pattern of activity enhancement already existed for some child pornography offenses, child pornography offenses as a whole were omitted from Section 505, without any distinction between trafficking and receipt (which received the enhancement) and production and possession (which did not). And Section 507 was implemented for exactly such a scenario: to ensure "reasonable consistency" across the Guidelines after implementation of changes based on the other directives of the Sexual Predators Act. Given that a pattern of activity enhancement then applied to trafficking and receipt of child pornography and Congress' directive to apply such an enhancement to aggravated sexual abuse, sexual abuse, sexual abuse of a minor or ward, coercion and enticement of a minor, contacting a minor, and transportation of minors and travel, the Commission could reasonably have concluded that it would be inconsistent to not apply such an enhancement to production and possession of child pornography offenses. Thus, the promulgation of § 4B1.5(b) to apply to the production of child pornography offenses is authorized by the delegation of authority in Section 507 of the Sexual Predators Act.

29

Moreover, the government argued at Phase I of the sentencing hearing that if § 4B1.5 was inconsistent with congressional directives, Congress would have said so by acting during the wait-and-see period. The Sixth Circuit addressed a similar issue in a case where the Commission promulgated a guideline in response to a congressional directive that appeared to be broader than the language of the directive itself. *See Butler*, 207 F.3d at 844. Specifically, through legislation, Congress directed the Commission to "promulgate guidelines or amend existing guidelines to provide that a defendant *21 years of age or older* who has been convicted of an offense shall receive an appropriate sentence enhancement if the defendant involved a minor in the commission of the offense." *Id.* (quoting Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 140008, 108 Stat. 2033 (1994)) (emphasis added). However, when the Commission promulgated this enhancement as § 3B1.4 of the Guidelines, it dropped the age restriction, applying the enhancement instead to all offenders regardless of age. *Id.* at 844; *see also* U.S. SENT'G GUIDELINES MANUAL § 3B1.4 (U.S. SENT'G COMM'N 2024). In addressing a challenge to the Commission's authority to promulgate § 3B1.4 without an age restriction, the Sixth Circuit noted that the Commission submitted the proposed amendment to Congress, through the procedure set forth in the Sentencing Reform Act, and explicitly informed Congress that the amendment was implementing the legislation's directive in a "slightly broader form." *Id.* at 845 (quoting 60 Fed. Reg. at 25086). Nonetheless, Congress did not act to modify or disapprove the amendment, which then went into effect. *Id.* The Sixth Circuit concluded that "Congress reserved for itself the opportunity to review

30

proposed amendments to guidelines through a 'report and wait' provision, and . . . by failing to act to modify or disapprove [the amendment] even when notified that it was different from the directive enacted in [the legislation], Congress, in effect, approved of [the amendment] as the appropriate reflection of its policy on the sentencing of those who involved minors in their crimes." *Id.* at 846. Thus, the Sixth Circuit found that the intent of Congress and the position of the Commission were not at odds and the enactment of the enhancement without the age restriction was within the bounds of the Commission's authority. *Id.*

Similarly, in this case, the Commission sent the proposed § 4G1.5 to Congress for approval. 66 Fed. Reg. 30512 (June 6, 2001). And, in addition to the proposed guideline language, the Commission also submitted the proposed commentary language to Congress, thereby informing Congress of what offenses the enhancement would be applicable to. *Id.* at 30525. Although, unlike the facts in *Butler*, the Commission did not explicitly inform Congress that the proposed amendment applied to more offenses than set forth in Section 505 of the Sexual Predators Act, the Commission did state that the proposed amendment was "promulgated primarily in response to the . . . Sexual Predators Act" and that "[i]n furtherance of the directives [in the Sexual Predators Act] the Commission initiated a comprehensive examination of the guidelines under which most sex crimes are sentenced." *Id.* at 30526. The Commission also informed Congress that he first part of the proposed amendment, that is, the proposed § 4B1.5, "addresses the [Sexual Predators] Act's directive to increase penalties in any case in which the defendant engaged in a pattern of

31

activity of sexual abuse or sexual exploitation of a minor." *Id.* In light of this information, and the clear language presented in the proposed amendment indicating that such enhancement would apply to offenses beyond those specifically enumerated in Section 505 of the Sexual Predators Act, Congress's inaction on the proposal "compels a finding that the intent of Congress" was aligned with the proposed amendment. *See Butler*, 207 F.3d at 846. Thus, even absent the catch-all provision of Section 507, the Court concludes that the promulgation of § 4B1.5 to apply to production of child pornography offenses did not exceed the scope of the Commission's delegated authority under Section 505 of the Sexual Predators Act.

Alternatively, even if the promulgation of § 4B1.5(b) as to production of child pornography offenses was not authorized by the Sexual Predators Act, it was nonetheless authorized by the delegation of authority in the Sentencing Reform Act. At Phase I of the sentencing hearing, the government argued that the Commission could have promulgated § 4B1.5 at any time prior to the Sexual Predators Act, pointing to the "broad direction" under § 994 of the Sentencing Reform Act.

Section 994(a) generally directs the Commission to promulgate guidelines and policy statements. 18 U.S.C. § 994(a). "This section is the enabling statute for the Sentencing Guidelines as a whole and gives the Commission 'broad authority to promulgate guidelines and policy statements.'" *United States v. Jackson*, No. 20-13277, 2021 WL 4074999, at *2 (11th Cir. Sept. 8, 2021) (quoting *United States v. Pridgeon*, 853 F.3d 1192, 1199 (11th Cir. 2017)).

32

The Sixth Circuit has previously addressed the Commission's general authority under § 994(a) in the scope of a challenge to whether the Commission exceeded the authority set forth in the enabling statute for the career offender guideline, by including conspiracy offenses in the definition of "controlled substance offenses," even though conspiracy offenses were not among the specifically enumerated "controlled substance offenses" in the enabling statute.

As background, § 4B1.1 of the Guidelines sets forth the career offender enhancement for defendants who meet certain criteria, including that their instant offense of conviction is a crime of violence or a controlled substance offense and they had at least two prior felony convictions of either a crime of violence or a controlled substance offense. *United States v. Williams*, 53 F.3d 769, 770 (6th Cir. 1995) (quoting U.S. SENT'G GUIDELINES MANUAL § 4B1.1 (U.S. SENT'G COMM'N 1995)). Application Note 2 defines "controlled substance offense" as including conspiracy to commit such an offense. *Id.* at 771. Many defendants challenged whether the Commission exceeded the mandate of 28 U.S.C. § 994(h), the enabling statute for the career offender guideline, in including conspiracy in the definition of "controlled substance offense." *Id.* at 771–772.

Section 994(h), itself part of the Sentencing Reform Act, directs the Commission to:

> assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—
>
> > (1) has been convicted of a felony that is—

33

(A) a crime of violence; or

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46; and

(2) has previously been convicted of two or more prior felonies, each of which is—

(A) a crime of violence; or

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.

18 U.S.C. § 994(h). Section 994(h), however, does not mention the crime of conspiracy in the list of controlled substances offenses. *Williams*, 53 F.3d at 771. Thus, much as in this case, courts were faced with determining "whether the Sentencing Commission exceeded its statutory authority by expanding the definition of a 'controlled substance offense' beyond those offense specifically listed in" the enabling statute. *Id*.

The Sixth Circuit addressed this issue in May 1995. *See id*. At that point, the D.C. and Fifth Circuits had determined that the Commission exceeded its authority in promulgating § 4B1.1 to apply to drug conspiracy offenses. *Id*. at 771 (citing *United States v. Bellazerius*, 24 F.3d 698, 701–02 (5th Cir. 1994) and *United States v. Price*, 990 F.2d 1367, 1369 (D.C. Cir. 1993)). On the other hand, the First, Third, Fourth, Seventh, Ninth, and Tenth Circuits had all concluded that the Commission properly used its general authority under § 994(a) to include conspiracy as a predicate or triggering offense. *Id*. at 771–72 (citing *United States v. Piper*, 35 F.3d 611, 615–19 (1st Cir. 1994); *United States*

34

*v. Kennedy*, 32 F.3d 876, 889–90 (4th Cir. 1994); *United States v. Damerville*, 27 F.3d 254, 256–57 (7th Cir. 1994); *United States v. Hightower*, 25 F.3d 182, 186–87 (3d Cir. 1994); *United States v. Allen*, 24 F.3d 1180, 1185–87 (10th Cir. 1994); and *United States v. Heim*, 15 F.3d 830, 831–32 (9th Cir. 1994)).[9]

The Sixth Circuit joined the majority of other circuits and concluded that, "[b]ased on principles of statutory interpretation, deference, and logic, as well as the legislative history of 28 U.S.C. § 994(h)," the Commission "did not exceed its statutory authority by including conspiracy within the definition of a 'controlled substance offense' under the career offender guidelines." *Id*. at 772. In echoing that conclusion, the Eleventh Circuit more recently stated that "§ 994(a) of the enabling statute vests the Commission with broad authority to promulgate guidelines and policy statements and 'provides independent grounds for the career offender provision.'" *United States v. Pridgeon*, 853 F.3d 1192, 1199 (11th Cir. 2017) (quoting *United States v. Weir*, 51 F.3d 1031, 1032 (11th Cir. 1995)).

Likewise, in this case, even if the Commission's promulgation of § 4B1.5 to apply to production of child pornography offense was not authorized by the enabling statue, the Sexual Predators Act, it was nonetheless authorized under the broad authority in § 994(a) to promulgate guidelines. In other words, because the inclusion of production of child pornography as a "covered sex offense" in § 4B1.5 does not conflict with the directive in the Sexual Predators Act, the Commission was authorized under § 994(a)'s general

---

[9] Although not mentioned in the Sixth Circuit's opinion, the Eleventh Circuit joined this majority seven days before the Sixth Circuit also joined the majority. *See United States v. Weir*, 51 F.3d 1031 (11th Cir. 1995).

35

directive to promulgate a guideline more expansive than that specifically provided for in Section 505 of the Sexual Predators Act. Accordingly, for this alternate reason, the Commission's promulgation of § 4B1.5 to apply to production of child pornography offenses did not exceed the congressional delegation of authority.

### 2. *Kisor* Issue

Having concluded that the Commission was authorized to promulgate § 4B1.5 to apply to production of child pornography offenses, the Court must now turn to what, as discussed *supra*, is best characterized as an alternate argument: that, pursuant to *Kisor*, the Court should not defer to the commentary's definition of a "covered sex crime" [*See* Doc. 52, p. 5].

In *Kisor*, the Supreme Court addressed the applicability of so-called *Auer* or *Seminole Rock* deference, in which courts defer to agencies' reasonable readings of genuinely ambiguous regulations. 588 U.S. at 563. [10] The Supreme Court clarified that

---

[10] At Phase I of the sentencing hearing, the Court asked the parties to address the continued applicability of *Auer* deference, as limited by *Kisor*, in light of the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) [Doc. 62].

In *Loper Bright*, the Supreme Court concluded that the rule of deference set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), providing that courts should defer to the "permissible" agency interpretations of statutes those agencies administer, was in conflict with Section 706 of the Administrative Procedure Act, which codified "the unremarkable, yet elemental proposition . . . that courts decide legal questions by applying their own judgment." 603 U.S. at 377–78, 391–93. Under *Chevon* deference, similar to *Auer* deference, when addressing an agency's interpretation of a statute, courts first had to apply the traditional tools of statutory construction to determine whether the intent of Congress was clear. *Id.* at 396–97. But, in the second step, if the statute was silent or ambiguous regarding the specific issue, courts "had to set aside the traditional interpretive tools and defer to the agency if it had offered a permissible construction of the statute[.]" *Id.* at 397 (internal quotation marks omitted). The Supreme Court concluded that this defied the command of Section 706 of the APA, that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

36

this deference applies only in limited circumstances. *Id.* Specifically, the regulation at issue must be "genuinely ambiguous," even after a court has resorted to all the standard tools of interpretation. *Id.* at 573, 575. If genuine ambiguity remains after application of these tools of interpretation, the agency's reading of the regulation still must be reasonable, that is, it must fall "within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 575–76. And, even if the agency's interpretation is reasonable, the "court must make an independent inquiry into whether the character and context of the agency's interpretation entitles it to controlling weight." *Id.* at 576.

While this final inquiry "does not reduce to any exhaustive test" the Supreme Court "laid out some especially important markers for identifying when *Auer* deference is and is not appropriate." *Id.* at 576–77. First, the interpretation must be the agency's authoritative or official position. *Id.* at 577. Second, the agency's interpretation of the regulation must in some way implicate the agency's substantive expertise. *Id.* Finally, the interpretation must reflect "fair and considered judgment" by the agency. *Id.* at 579.

---

provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* at 391, 399. The Court thus overruled *Chevron* and held that courts must exercise independent judgment in determining whether an agency has acted within its statutory authority, and "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 412–13.

The Court conducted Phase I of the sentencing hearing on May 20, 2025 [Doc. 63]. Seven days later, the Sixth Circuit resolved the question of *Loper Bright*'s applicability to this issue in a published opinion. *See United States v. Prather*, 138 F.4th 963 (6th Cir. 2025). The Sixth Circuit explicitly held that "*Loper Bright* did not overrule *Auer*." *Id.* at 974. Given this binding precedent, the Court will proceed under the presumption that *Auer* and *Kisor* remain good law.

37

The Supreme Court has concluded that the Sentencing Guidelines are equivalent to legislative rules adopted by federal agencies, and the commentary to the Guidelines are "akin to an agency's interpretation of its own legislative rules," and applied *Auer* deference to the Guidelines' commentary. *Stinson v. United States*, 508 U.S. 36, 44–45 (1993). Thus, the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38; *see also United States v. Riccardi*, 989 F.3d 476, 484 (6th Cir. 2021).

The Sixth Circuit noted that *Stinson*'s "plain-error test seemed to require courts to give great deference to the commentary." *Riccardi*, 989 F.3d at 484. But the Sixth Circuit also noted how *Auer* deference had been narrowed in scope by *Kisor* post-*Stinson*. *Id.* at 484–85. And the Sixth Circuit found that the limitations set forth in *Kisor* applied equally to the commentary to the Sentencing Guidelines. *Id.* at 485; *see also United States v. Smith*, 79 F.4th 790, 789 (6th Cir. 2023) ("This court has held that *Kisor* applies to interpretation of the Guidelines"). The Sixth Circuit specifically noted that *Kisor* rejected the argument that an agency could simply change a legislative rule simply by changing its interpretation, because the *Kisor* decision itself imposed limitations on the deference to be given to an agency's interpretation of its own rules. *Riccardi*, 989 F.3d at 485. And the Sixth Circuit found that the same concern applies regarding *Stinson*, as "[o]nly the guidelines (not the commentary) must go through notice-and-comment rulemaking. *Id.* Thus, the Sixth Circuit concluded that "if the Commission could freely amend the guidelines by amending

38

the commentary, it could avoid these notice-and-comment obligations. The healthy judicial review that *Kisor* contemplates thus will restrict the Commission's ability to do so." *Id.* The Sixth Circuit has thus concluded that courts should treat the commentary to the Guidelines as authoritative. *United States v. Knight*, No. 22-5919, 2023 WL 5338637, at *4 (6th Cir. Aug. 18, 2023) (citing *United States v. Havis*, 927 F.3d 382, 386–87 (6th Cir. 2019) (en banc) and *Hollon*, 948 F.3d at 757). The Sixth Circuit explained that "[t]hat authority exists so long as the commentary's interpretation does not expand the application of the Guidelines beyond the text nor add to the offenses specified in the statutory text." *Id.* (citing *United States v. Preece*, No. 22-5297, 2023 WL 395028, at *6–7 (6th Cir. Jan. 25, 2023)).

Applying *Kisor*, the Court first must determine whether the language of the guideline that the commentary seeks to interpret is "genuinely ambiguous." *See Kisor*, 588 U.S. at 573, 575. The specific language at issue here is whether defendant's instant offense of conviction is a "covered sex crime." U.S. SENT'G GUIDELINES MANUAL § 4B1.5(b) (U.S. SENT'G COMM'N 2024). In determining whether this language is "genuinely ambiguous" the Court looks to the traditional tools of statutory construction. *See Kisor*, 588 U.S. at 573, 575. This begins with an analysis of the text. *Arangure v. Whitaker*, 911 F.3d 333, 338 (6th Cir. 2018). But as the Sixth Circuit noted: "'[L]egal interpretation [is] more than just a linguistic exercise'—it includes the canons." *Arangure*, 911 F.3d at 338–39 (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS xxvii (1st ed. 2012)). "Canons are general background

39

principles that courts have developed over time to guide statutory interpretation—the 'interpretive rules of the road.'"  *Id.* at 339 (quoting Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2121 (2016) (book review)).

On its own, the term "sex crime" would likely be unambiguous—that phrase clearly refers to crimes of a sexual nature.  But the addition of the word "covered" before the term "sex crime" changes the meaning entirely.  As relevant here, the word "covered" means "[t]o be extensive enough to include or comprehend; to include within its application or scope. . . ."  *Cover*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/ dictionary/cover_v1?tab=meaning_and_use#7896830 (last visited Oct. 17, 2025). Accordingly, the phrase "covered sex crimes," means "included sex crimes," indicating that the phrase covers a limited number of sex crimes, rather than all possible sex crimes.

The question, then, is how the Court is to determine which sex crimes are included within the meaning of § 4B1.5(b).  Nothing in the text of the guideline itself indicates which sex crimes are "covered."  And none of the canons of statutory interpretation assist in answering this question.  The Court could look to other portions of the Guideline under the presumption of consistent usage canon.  *See* SCALIA & GARNER, *supra*, at 170 ("A word of phrase is presumed to bear the same meaning throughout a text[.]").  But the only other place in the text of the Guidelines themselves that the phrase "covered sex crime" is used is in § 4B1.5(a), which, like subsection (b), does not provide any indication of which sex crimes are "covered."  *See* U.S. SENT'G GUIDELINES MANUAL § 4B1.5(a) (U.S. SENT'G COMM'N 2024).  Because the Court cannot determine which sex crimes are "covered" by

40

reviewing the text of the Guideline, even after applying the canons of statutory construction, the Court concludes that this phrase is genuinely ambiguous.

Before the Court can defer to the commentary's interpretation of "covered sex crime, however, the Court must determine whether that interpretation falls "within the zone of ambiguity the court has identified[.]" *Kisor*, 588 U.S. at 575–76. As discussed *supra*, Application Note 2 to § 4B1.5 contains a specific list of offenses that are "covered sex crimes" for purposes of the guideline, specifically:

> (A) an offense, perpetrated against a minor, under (i) chapter 109A of title 18, United States Code; (ii) chapter 110 of such title, not including trafficking in, receipt of, or possession of, child pornography, or a recordkeeping offense; (iii) chapter 117 of such title, not including transmitting information about a minor or filing a factual statement about an alien individual; or (iv) 18 U.S.C. § 1591; or (B) an attempt or a conspiracy to commit any offense described in subdivisions (A)(i) through (iv) of this note.

U.S. SENT'G GUIDELINES MANUAL § 4B1.5(b) cmt. n.2 (U.S. SENT'G COMM'N 2024). This clearly falls within the "zone of ambiguity" the Court has identified. The language of § 4B1.5(b) is ambiguous as to which sex crimes are deemed "covered"; Application Note 2 provides a clear answer to that question.

Finally, the Court must determine whether the "character and context" of the Commission's interpretation of the term "covered sex crime" entitles it to controlling weight. *Kisor*, 588 U.S. at 576. Looking to the specific factors set forth in *Kisor*, the Court first notes that the commentary to the Guidelines is the Commission's official position. *United States v. Phillips*, 54 F.4th 374, 385 (6th Cir. 2022) ("[T]he Guidelines commentary represents the official position of the Commission"). Second, as the Sixth Circuit has

41

noted, "interpreting the Guidelines to promote sentencing goals squarely implicates the Commission's 'substantive expertise.'" *Id*. Indeed, "[t]he functional purpose of the commentary is to assist in the interpretation and application of the Guidelines, which are within the Commission's particular area of concern and expertise and which the Commission itself has the first responsibility to formulate and announce." *Id*. (internal quotation marks and alterations omitted). Third, Application Note 2 reflects the "fair and considered judgment" of the Commission. As discussed in detail *supra*, the issue of sentencing enhancements for repeat sex offenders was repeatedly considered by the Commission, both before and after the Sexual Predators Act, including consideration of which offenses should be "covered" by any enhancement. *See* 1996 REPORT TO CONGRESS, *supra*, at ii, 34, 40; SENT'G FED. SEXUAL OFFENDERS, *supra*, at 1; U.S. SENT'G GUIDELINES MANUAL, app. C (Vol. II), amend 615 (U.S. SENT'G COMM'N 2024). Ultimately, the Commission decided upon the list of "covered" offenses contained in Application Note 2 and submitted that list to Congress in connection with the proposed enhancement in response to the Sexual Predators Act. *See Phillips*, 54 F.4th at 387–86 (stating that an interpretation that "was not instituted for any post hoc purpose, but was put directly into the commentary more than fifteen years ago following a period of public consultation" reflected the Commission's "fair and considered judgment").

Accordingly, the Court finds that the interpretation of "covered sex crime" in Application Note 2 to § 4B1.5(b) is due deference. And there appears to be no dispute that defendant's production of child pornography offenses fit squarely within that definition.

Defendant's objection to the five-level enhancement under § 4B1.5(b) is therefore **OVERRULED**.

### 3. Mootness

Alternatively, as described earlier, under the Revised PSR, defendant's current total offense level is 50, but is capped at the highest offense level of 43 [RPSR ¶¶ 85, 87]. Thus, for a reduction in the offense level to have any impact on defendant's guideline range, he would need a total of 8 levels reduced, to bring him to a level 42, resulting in a guideline range of 360 months to life. But the Court already rejected defendant's challenge to the four-level enhancement under § 2G2.1(b)(4). Accordingly, even if the Court were to remove the five-level enhancement under § 4B1.5, defendant's total offense level would still remain at the capped level of 43, and therefore, his guideline range would remain life.

## IV. Conclusion

For all of the reasons set forth above, defendant's objections to the PSR are **SUSTAINED** in part and **OVERRULED** in part. Defendant's objection to Paragraphs 33 to 41 of the PSR is **SUSTAINED**, and all other objections are **OVERRULED**. Defendant's guideline range remains calculated based on a total offense level of 43, criminal history category I, resulting in a guideline range of life. The courtroom deputy will contact the parties to schedule Phase II of the sentencing hearing. The Court will take up all other sentencing arguments and impose sentence at that time.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE